IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.  5:15-cv-00229-BO

| | |
|---|---|
| COUNTY OF YADKIN, | |
| Plaintiff, | |
| v. | **COMPLAINT** |
| CAH ACQUISITION COMPANY 10 LLC; HMC/CAH CONSOLIDATED, INC.; and RURAL COMMUNITY HOSPITALS OF AMERICA, LLC, | |
| Defendants. | |

NOW COMES the COUNTY OF YADKIN (the "County"), by and through its undersigned counsel, complaining of Defendants CAH ACQUISITION COMPANY 10 LLC ("CAH 10"); HMC/CAH Consolidated, Inc. ("HMC"); and Rural Community Hospitals of America, LLC ("RCHA") (collectively "Defendants"), and hereby alleges the following in support of its claim(s):

<u>Parties</u>

1.     The County is a political subdivision of the State of North Carolina and brings this action on its own behalf and for the benefit of the citizens and residents of Yadkin County.

2.     Upon information and belief, Defendant CAH 10 is a for-profit Delaware limited liability company with its principal office in Yadkinville, North Carolina.  Upon information and belief, CAH 10 has one member, HMC, which also acts as its manager/official/organizer.  CAH 10 has a registered agent for service of process in Wake County, North Carolina.

3.     Upon information and belief, Defendant HMC/CAH Consolidated, Inc. is the sole member and manager of Defendant CAH.  According to the Affidavit of Trent Skaggs, HMC is a Delaware corporation with its principal office in Kansas City, Missouri.

4.     According to filings with the North Carolina Secretary of State, Defendant Rural Community Hospitals of America, LLC is a West Virginia limited liability company with its principal office in Kansas City, Missouri.  Upon information and belief, Defendant RCHA is also owned and controlled by Defendant HMC/CAH Consolidated, Inc.  According to the Affidavit of Trent Skaggs, RCHA is under contract to operate the Hospital for Defendant CAH 10 (but is not a party to the lease agreement with the County).

5.     Jurisdiction and venue are proper in this Court.  Defendants, directly and through subsidiaries and related entities, are engaged in substantial activity in this state.  They are subject to the personal jurisdiction of the state and federal courts of North Carolina.

6.     The Wake County Superior Court was and is a proper trial division for this case as the total amount in controversy exceeds Twenty-Five Thousand Dollars ($25,000) pursuant to N.C.G.S. § 7A-243.  The County has not alleged that the amount of damages from Defendants' conduct exceeds $75,000 and such evidence was not otherwise in the record at the time of CAH 10's removal on the eve of a scheduled hearing on the County's motion for preliminary injunction.

<u>Brief Summary of Action</u>

7.     This action involves Defendants' unjustified closure of the Hospital in breach of its express obligations to the County, in violation of an Order from the Wake County Superior Court, and to the serious detriment of the local community.  Such closure resulted in the loss of the only hospital in Yadkin County, which provides a vital safety net for Yadkin County

residents, including but not limited to life-saving emergency medical and surgical treatment and the availability of an inpatient hospital for residents who need inpatient care.

8.     Following Defendants' unilateral and wrongful closure, local residents are required to travel out of the county for any serious medical needs, which results in delayed medical evaluation and treatment.  Many residents relied upon physicians employed by Defendants for their medical care, prescriptions, and referrals for specialty care.

9.     Despite their unilateral decision to close, Defendants have refused to make appropriate arrangements to ensure that these patients receive the care they need. Indeed, only days after locking the doors to the Hospital, patients arrived for their scheduled appointments because **they had received absolutely no warning from Defendants** that they would close the Hospital.  Defendants provided no alternative care arrangements for these patients, many of whom had urgent medical needs and expiring prescription.

10.    Upon information and belief, Defendants, largely in secret, conspired to close on May 23, 2015 without advance notice to the County, the public at large or even to patients under the care of their employees.  Defendants did so after negotiating a lease extension with the County in April 2015 to operate the Hospital through July 31, 2015.  Moreover, upon information and belief, earlier in 2015, Defendants urged employees not to look for other jobs or it would result in closure earlier than the conclusion of the Lease.

11.    Additionally, Defendants' closure of the Hospital resulted in the termination of all or nearly all hospital employees, many of whom dedicated their lives to caring for our local citizens.  Moreover, because the vast majority of these employees receive health insurance and other benefits through Defendants, many have not only lost their livelihood, but also the insurance that allowed their families to afford necessary medical treatment.

12.     Defendants' intentional and callous conduct put the lives of local residents at risk simply to improve their bottom line.  Defendants refused to take even modest steps to protect patients, such as advance notification of closure, making arrangements for alternative treatment, or arranging for emergency response and transport of patients in crisis.

13.     The Wake County Superior Court issued a temporary restraining order on May 22, 2015 at 5:15 p.m. Eastern Daylight Time (EDT) to keep the Hospital open for a period of ten (10) days on an emergency basis.  However, CAH 10 intentionally defied that order and closed the Hospital shortly thereafter.

14.     This action involves claims by the County against Defendants related to their unjustified closure of the Hospital without adequate notice and in breach of multiple legally-binding contracts and a Court Order and related conduct.

The Parties' Contracts

15.     The County owns a facility located at 624 W. Main Street, Yadkinville, North Carolina, (the "Hospital Premises") which has been operated as a community hospital for decades (the "Hospital").

16.     The Hospital is a critical access hospital, meaning that it provides a vital safety net for a mostly rural community, including emergency services.  Critical Access Hospitals are governed differently than other hospitals due to the important role they play in the health care delivery system.

17.     Pursuant to an "Agreement to Purchase and Lease" involving CAH 10 and the County dated April 22, 2010 (the "Sale Agreement"), CAH 10 purchased the personal property of the Hospital in order to operate a critical access hospital in Yadkin County.  A true copy of the Sale Agreement is attached hereto as Exhibit 1 and is incorporated by reference.

18.     CAH 10 expressly agreed in the Sale Agreement that it "shall continue to provide the same or similar clinical hospital services to its patients in medical, surgery, pediatrics, outpatient, and emergency treatment, including emergency services for the indigent that the Hospital provided prior to" this agreement. CAH 10 contracted not to terminate such services except as allowed by law or by review procedures "designed to guarantee public participation."

19.     CAH 10 agreed to ensure indigent care was available to the population of the local community served by the Hospital as previously demonstrated and determined mutually with the County.  CAH 10 also agreed that it would ensure that admission to and services at the Hospital were available without discrimination or preference.

20.     The Sale Agreement barred CAH 10 from shutting down the Hospital.  Indeed, it provided that if CAH 10 failed to operate the Hospital as a community general hospital open to the public and free of discrimination, all ownership and rights in the Hospital would revert to the County.

21.     Defendant CAH 10 leased the Hospital Premises and agreed to operate it as a community general hospital pursuant to a "Hospital Lease" dated May 1, 2010 (the "Original Lease" and collectively with all amendments thereto, the "Lease"). A true copy of the Original Lease and its amendments are attached as Exhibit 2 and is incorporated herein by reference.

22.     The County and CAH entered into several amendments, The County reduced the monthly rent for the hospital premises to zero in the Second Amendment to the Lease.  Thus, CAH 10 was using the hospital premises for free and keeping all of the money brought in from provision of medical care to patients.

23.     Thereafter, the parties entered a Third Amendment to Hospital Lease on April 2, 2015 ("Third Lease Amendment"), extending the term of the lease through and until July 31, 2015.

24.     The Lease provided that it was a material default for CAH 10 to desert or vacate the Hospital Premises.

25.     Defendant CAH 10 holds the license to operate the Hospital.  It was and remains the only party with current legal authority to operate the Hospital and provide medical care, including emergency care, to patients at the only hospital in Yadkin County.

Facts Related to Defendants' Unjustified Closure

26.     During May, 2015, the County and CAH 10 were in negotiations regarding whether CAH 10 would continue to lease and operate the hospital after the term of the amended Lease expired on July 31, 2015.  As a component of its obligations related to expenditure of public funds and in compliance with state law, the County also evaluated other potential partners to operate the Hospital after July 31, 2015.

27.     The County worked diligently to avoid disruption of medical services for County residents, but Defendants made unreasonable demands, which the County could not, in good conscience, accept.  For example, CAH 10 demanded that the citizens of Yadkin County pay them $1,000,000.00 to extend the lease by one year (with CAH 10's option to extend further or not as it wished); pay CAH 10 $300,000.00 per year for caring for the local population; and commit additional, unlimited funds for improvements.  Alternatively, CAH 10 offered to "sell" the Hospital's assets and property back to the Hospital for $1,500,000.00 **plus** the County would be required to accept a debt of up to $1,375,000.00 that belonged to Defendants **and** pay all

bankruptcy debts of CAH 10 in an unspecified amount. Attached as <u>Exhibit 3</u> and incorporated by reference is a true and accurate copy of this e-mail demand from Defendants.

28.     Such demands were unreasonable and unjustified.  Thus, the County continued its efforts to negotiate reasonable terms with CAH 10, without success, and to seek an alternative operator to take over the Hospital and continue operations as of July 31, 2015.

29.     Defendants apparently made the decision to shut down the Hospital, without prior notice of its intent to the County, the public, or its patients.  While Defendants made threats to the County during negotiations that it might elect to halt operations, largely in order to extract a lease extension and other concessions, it never provided notice to the County that it was closing the Hospital on May 22 or 23 2015 or any other date upon which such action would occur.

30.     Instead, Defendants conspired to dismantle Hospital operations without providing adequate public notice, knowing that such action would be detrimental to the health and well-being of the citizens of Yadkin County.

<u>Defendants' Plan to Close the Hospital is Discovered</u>

31.     Upon information and belief, on Friday, May 22, 2015, state regulators from the North Carolina Department of Health and Human Services ("DHHS") were in the Hospital carrying out a regulatory survey when they were told that the Hospital would be closed and all employees fired at 7:00 a.m. the following day, Saturday, May 23, 2015.

32.     A DHHS representative informed the County that Defendants were reporting the facility would close on Saturday, May 23, 2015.

33.     The County received no notification from Defendants that it would cease operations or shut down on May 23, 2015, or any other day or that Defendants would refuse to

care for residents of the local community until the conclusion of the parties' Lease, which was negotiated the month prior.

34.     Moreover, unbeknownst to the County, the Hospital apparently mailed a notice to some or all of its employees that they would be terminated effective May 23, 2015.  A copy of this notice is attached as <u>Exhibit 4</u> and is incorporated by reference. Upon information and belief, numerous employees did not receive this notice until well after May 23, 2015.

<u>The County Obtains a TRO to Prevent the Hospital's Closure</u>

35.     Upon learning of Defendants' apparent intent to close the Hospital on May 23, 2015, in violation of its agreements with the County and to the detriment of the local community (and without public notice), the County commenced a civil action in Wake County at approximately 4:45 p.m. EDT on Friday, May 22, 2015 to halt the impending closure.

36.     The County applied to the Wake County Superior Court requesting permission to file a complaint within twenty (20) days, pursuant to Rule 3, of the North Carolina Rules of Civil Procedure.  The Court granted the County the right to file a complaint on or before June 11, 2015.

37.     The Superior Court issued a Temporary Restraining Order at 5:15 p.m. EDT on Friday, May 22, 2015 ("the TRO") prohibiting CAH 10 from ceasing operations of the Hospital. The TRO directed the parties to appear on Monday, June 1, 2015, for a hearing on the County's motion for preliminary injunction.  A copy of the TRO is attached as <u>Exhibit 5</u> and is incorporated by reference.

38.     The County, through counsel, delivered a copy of the Application, Summons, Motion, the affidavit in support thereof, and the TRO to Dennis Davis by email at 5:59 p.m. EDT on May 22, 2015.  A copy of this e-mail is attached as <u>Exhibit 6</u> and is incorporated by reference.

Upon information and belief, Mr. Davis is the Secretary and Executive Vice President of HMC, the sole member and manager of Defendant CAH 10, and the Chief Legal Officer of RCHA, a related entity which apparently operates the Hospital for Defendants.

39.     Mr. Davis confirmed receipt of the email five minutes later at 6:04 p.m. EDT. A copy of this e-mail is attached as Exhibit 7 and is incorporated by reference. Thus, Defendants had actual notice of the TRO at approximately 6:00 p.m. EDT on May 22, 2015.

40.     Mr. Davis' confirmed receipt of the Application, Summons, Motion and supporting affidavit, and the TRO on May 22, 2015 constitutes actual notice of the conditions of the TRO and obligated CAH 10 and "those persons in active concert or participation with [it]" (which includes all Defendants) to abide by those conditions.

41.     The County also attempted hand-delivery upon Defendants CAH's registered agent in Wake County on May 22, 2015, but the office was closed and there was not an afterhours delivery option. The County hand delivered a copy of the TRO to the Hospital in the evening hours of May 22, 2015, but Hospital staff refused to accept the documents. Upon information and belief, their refusal was due to direct orders from Shawn Bright, the Vice President of Operations for CAH 10 not to accept the documents. Mr. Bright also refused to accept service himself. In other words, CAH 10 intentionally sought to avoid hand delivery of the TRO because they knew what the documents said. The pleadings were subsequently delivered to all Defendants and/or to their counsel.

42.     At the time the TRO was delivered to Mr. Davis, the Hospital was open and operational.

43.     At the time the TRO was delivered to Mr. Davis, numerous employees were actively at work in the Hospital.

44      At the time the TRO was delivered to Mr. Davis, patients were being treated at the Hospital.

45      At the time the TRO was delivered to Mr. Davis, patients who arrived could still receive emergency treatment from hospital staff.

46      At the time the TRO was delivered to Mr. Davis, the doors to the Hospital were not locked or, at a minimum, could easily be unlocked.

47      At the time the TRO was delivered to Mr. Davis, DHHS had not been notified that the Hospital was closed and the license remained in effect for an operational hospital.

48      At the time the TRO was delivered to Mr. Davis, the Sale Agreement and Lease governing Defendants' operation of the hospital were still in effect until at least July 31, 2015.

49      At the time the TRO was delivered to Mr. Davis, the vast majority of Hospital employees had not been fired or, at a minimum, had not received any notice that they were fired.

50      At the time the TRO was delivered to Mr. Davis, patients were scheduled to be seen by Hospital-employed physicians in the coming days – and these patients had not received any notice that they would not be treated or should not appear for their appointments.

51      At the time the TRO was delivered to Mr. Davis, employees were scheduled to arrive for work during the overnight shift on May 22, 2015 and the following morning.

52      In short, at the time the TRO was delivered to Mr. Davis, Defendants had not ceased operations at the Hospital.

Defendants Defy the Court and Shut Down the Hospital

53      Despite having actual notice of the TRO, Defendant CAH 10 proceeded to cease operations at the Hospital and lock its doors, leaving the citizens of Yadkin County without a hospital for emergency and other medical services.

54.     In reality, once Defendants learned of the Court Order mandating that they not cease operations of the Hospital, they immediately proceeded to violate the order. Indeed, upon information and belief, the timeline for the secret closure was accelerated after receipt of the Court's Order.

55.     Upon information and belief, after receipt of the TRO, Defendants' executive management contacted Mr. Bright at the Hospital and directed him to shut down the Hospital in knowing and direct violation of a court order.

56.     Specifically, upon information and belief, Mr. Bright received a phone call at approximately 6:00 p.m. from Trent Skaggs, an officer of one of the Defendants, telling him to shut down the Hospital immediately, presumably because of the Court's Order directing that they not close. Immediately after the call, Mr. Bright directed hospital employees to lock the doors and shut down the Hospital.

57.     At the time of this phone call and the directive to shut down, there were patients actively being treated in the Hospital emergency department.

58.     Upon information and belief, after learning of the TRO, Hospital management, working for Defendants, ordered staff to discharge all patients from the emergency department as quickly as possible. The last patients were discharged at approximately 6:40 p.m. EDT, well after Defendants had notice of the TRO barring them from ceasing operations. The Affidavit of Julie Waddell is attached as Exhibit 8 and incorporated by reference.

59.      Upon information and belief, Defendants showed little or no concern for these patients' health, safety, or well-being, but front line staff continued to address these patients' needs as quickly as possible.

60. Upon information and belief, Defendants ordered staff to place closed signs on the doors and cover signage elsewhere at the Hospital.

61. Upon information and belief, following such actions, CAH 10 and the other Defendants, working in concert, ceased operations of the Hospital and locked the doors preventing other patients—including those in emergency situations—from seeking or receiving care at the Hospital.

62. Defendants took no meaningful actions to ensure the safety of patients with emergency medical needs who would arrive at the emergency department after they locked the doors.

63. Instead, after learning that Defendants shut down the Hospital in violation of their legal contracts and a Court Order—without concern for the impact to the local citizens—the County promptly posted an emergency medical services unit at the Hospital to assist patients with emergency medical needs. Defendants offered no assistance, resources, or cooperation with the County's effort to prevent serious patient harm.

64. Upon information and belief, after learning of the Court's Order, Defendants notified staff—including those currently at work in the Hospital—that they were terminated or would shortly be terminated. Upon information and belief, after learning of the TRO, Defendants directed Hospital staff to contact other employees who would be starting work later in the evening of May 22 or on May 23, 2015 to direct them not to come to the Hospital.

65. At 6:03 p.m. EDT, minutes *after* the TRO was sent to Mr. Davis (and one minute before he confirmed receipt), Linda Way, who is, upon information and belief, a paralegal who works for Mr. Davis, sent an email to Azzie Conley, the Chief of the Acute and Home Care Licensure Section of DHHS's Division of Health Service Regulation, with a letter announcing

the closure of the Hospital, "effective immediately" (the "Closure Notice"). A copy of this Closure Notice is attached as Exhibit 9 and is incorporated by reference.

66. In other words, at the time Defendants learned of the Court Order enjoining their ceasing operations at the Hospital, the Hospital was operational and the license was still in effect.

67. Shortly after receiving such notice, Defendants forced staff to discharge patients from its emergency department, locked the doors, and provided official notice to DHHS that it was closing, which could have dramatic effects on the ability of the County or anyone else to operate the Hospital in the future under state licensure rules and Medicare requirements.

68. Mysteriously, Defendants issued a press release stating that the Hospital "closed its hospital business on May 23," the day **after** the TRO was issued, was delivered to Defendants, and Mr. Davis acknowledged receipt. A copy of Defendants' press release is attached as Exhibit 10 and is incorporated by reference.

69. Upon information and belief, the events described above occurred because Defendants intended to secretly shut down the Hospital on May 23, 2015, but, once they learned that the County obtained a Court Order barring them from ceasing operations, they sped up their timeline.

70. Upon information and belief, Defendants now wish to contend that the Hospital was shut down prior to 6:00 p.m. on May 22, 2015—despite having staff working and patients being treated at that time.

71. As part of the Hospital's closure, Defendants have fired all or nearly all employees who provided services at the Hospital. Such termination results in loss of the income that is necessary for these employees to feed themselves and their families.

72.     Termination also means that Defendants have halted or will halt health insurance and other benefits upon which these individuals and their families depend.  Upon information and belief, Defendants stopped providing health insurance and other benefits to its former employees on May 31, 2015.

73.     Upon information and belief, Defendants failed to provide notice to all Hospital employees.  The County has heard from employees who showed up for work to find the Hospital closed and shuttered.

74.     Upon information and belief, surrounding the closure of the Hospital, one or more Defendants removed items from the Hospital that were necessary and appropriate for medical treatment of patients and, as a result of the provisions of the parties' agreements, would have reverted to the County upon closure.

75.     While it cannot be confirmed at the present time, it is believed that these items were taken to another hospital affiliated with one or more Defendants.

<u>Failure to Address Serious Patient Needs After Closure</u>

76.     Since closure, Defendants have failed to meet the serious patient needs related to their medical treatment.

77.     By way of example, Defendants did not provide adequate notice to patients who were under the care of their employees.  Upon information and belief, patients under the care of Hospital employees received absolutely no advance notice of closure.

78.     The County has been contacted by numerous patients who arrived for treatment in the days after Defendants closed the Hospital with significant treatment needs, including prescription refills.

79.     Indeed, the North Carolina Medical Board requires that physicians provide at least thirty (30) days notice of closure to ensure patients can obtain their medical records and make alternative arrangements for medical treatment. Defendants prevented their employed physicians from taking such action, even though some patients would present to the Hospital for outpatient care by their physicians.

80.     Defendants did not provide adequate public notice of their impending closure to allow residents to evaluate their anticipated medical needs, transfer care to other providers, and know that they could not show up at the Hospital with urgent medical needs and receive treatment.

81.     Defendants also refused to provide notice to the County that they were closing the Hospital on May 22 or 23, 2015, which could have allowed the County to undertake steps to notify the public and assist local residents with the challenging issues that arise from closure of the only hospital in Yadkin County and the loss of their treating physicians and other caregivers.

82.     Defendants refused to arrange for adequate emergency response for patients who might (and did) arrive at the Hospital after closure with urgent or emergency medical needs. Defendants did not place anyone at the Hospital to help stabilize, transport, or even direct patients to alternative care. Indeed, they did not even notify the County prior to closure so that the County could make arrangements for these patients after Defendants locked the Hospital's doors.

83.     Defendants failed to take adequate measures to protect the Hospital facility from break-ins or other criminal activity causing increased risk to County employees. Upon information and belief, Defendants did not post security at the entrances or inside the Hospital to protect the medications (including narcotics), supplies, furnishings, or facility.

84.     Defendants did not provide adequate procedures for patients to obtain their medical records in a timely fashion, which generally is necessary to transfer care safely to another provider and ensure continuity of care.

85.     Many patients utilized Hospital employed physicians as their primary care physician, who would be responsible for referrals for specialists in order for such care to be provided and paid for by health insurance.  Upon information and belief, Defendants failed to make advance arrangements for transfer of such responsibilities.

86.     Defendant represented that it would continue to operate the Medical Records Department of the Hospital through the end of the lease term (July 31, 2015), but failed to do so in a reasonable way for patients.

87.     Upon information and belief, Defendants failed to provide reasonable advance notice to some or all Hospital employees of the impending closure on May 22 or 23, 2015.  Upon information and belief, certain employees arrived for work on a date after May 22, 2015 only to learn that the Hospital was closed and that they apparently had been terminated.

88.      Defendants failed to provide meaningful advance notice to employees such that they could seek other employment and make alternative arrangements for health insurance and other benefits.  Upon information and belief, as of May 29, 2015, some employees still did not know how to apply for continued health insurance.

89.     Defendants continued to violate the TRO for its entire duration by refusing to operate the hospital and failing to provide vital, life-saving medical services to the citizens of Yadkin County.

90.     The TRO entered on May 22, 2015 directed the parties to appear at 10:00 a.m. Monday, June 1, 2015 for a preliminary injunction hearing in Wake County Superior Court. The purpose of this hearing was to hold a hearing on continuation of the TRO and continued operation of the Hospital.

91.     However, on Friday, May 29, 2015 at approximately 1:45 p.m. EDT, less than one business day prior to the scheduled hearing in Wake County, which Defendants knew about since May 22, 2015, Defendant CAH 10 filed a notice of removal to this Court, depriving the Wake County Superior Court of further jurisdiction to enter a preliminary injunction or otherwise prevent the TRO from expiring.

92.     The County received no advance notice from Defendants or their counsel that they would remove this case. Instead, they were sent by email a notice of removal after it was filed.

93.     Upon information and belief, removal to this Court less than one business day before the scheduled hearing was a procedural maneuver designed to prevent the Wake County Court's issuance of a preliminary injunction and therefore to help ensure the lapse of the TRO.

94.     In its removal petition and supporting documentation, Defendant CAH 10 claimed that it has lost approximately $55,000 during the month of May 2015.

95.     However, while details were not provided, some or perhaps most of this loss is related to the Hospital's intentionally reducing operations and closure prior to the end of the month. CAH 10 fails to provide details for any month in which it did not shut down operations.

96.     Moreover, CAH 10 complains that it would have to pay a premium to re-hire employees. If true, such increase was caused by Defendants' own unlawful conduct in

terminating its employees in violation of its contractual obligations and the Court's Order. CAH 10 cannot now be heard to complain that the effect of its wrongful actions should insulate it from having to comply with a Court order or preexisting contracts.

## Claim One:   Breach of Contract

97.     The County hereby incorporates the prior allegations of its Complaint as if fully set forth herein.

98.     The Sale Agreement and the Lease were legally binding contracts.

99.     There were no unsatisfied conditions precedent to the formation or validity of these agreements.

100.     The parties began performance under these agreements in or about April or May 2010.

101.     The County complied with its obligations under the Sale Agreement and Lease.

102.     One or more Defendants materially breached the Lease and the Sale Agreement.

103.     The material breach(es) includes, but is not limited to, its failure to continue operating the Hospital as a community general hospital open to the public; its closure of the Hospital; substantial desertion and abandonment of the Hospital premises; failure to provide for the medical needs of community residents in the manner agreed; removal of items of equipment and property that should have reverted to the County under the terms of the agreements and the requirements of North Carolina General Statute § 131E-13; failure to pay applicable property taxes; and in other ways that will be shown at trial, including but not limited to those described herein.

104.     The contractual breach was never cured and, indeed, Defendants have made no meaningful efforts to cure their breaches.

105.    The County was damaged as a direct and proximate result of one or more Defendants' breaches in an amount that exceeds $25,000, which amount will be proven at trial.

106.    There was been no waiver of the right to pursue legal or equitable relief as a result of any agreement or the parties' conduct prior to or after termination.

### Claim 2:  Unfair Trade Practice

107.    The County hereby incorporates the prior allegations of its Complaint as if fully set forth herein.

108.    Defendants' conduct described herein and as will be proved at trial constitutes an unfair and deceptive trade practice pursuant to Chapter 75 of the North Carolina General Statutes in that it was intentional, unfair, deceptive, egregious, and/or injurious to the public.

109.    Defendants' conduct was in and affecting commerce.

110.    The County suffered actual damages as a direct and proximate result of Defendants' conduct in an amount to be proven at trial, but, in any event, more than $25,000.

111.    Defendants' breaches of contract were accompanied by sufficiently egregious and aggravating conduct such that they should be viewed as separate and distinct from a simple breach of contract.

112.    Upon information and belief, such aggravating conduct includes secretly removing property from the Hospital that would revert to the County; intentionally refusing to provide meaningful notice to the public or patients that Defendants would abandon the Hospital and stop providing vital medical services to the community; intentionally violating a Court Order barring CAH 10 from ceasing operations; blatant and intentional efforts to avoid hand delivery of the TRO as directed by executive leadership; and failure to provide adequate measures to protect the health and safety of community residents after closure.

113.	Citizens and residents of Yadkin County have been and continue to be harmed by Defendants' conduct as described herein and these residents are suffering ongoing harm from the loss of their only local Hospital.  The County is legitimately concerned that residents' care will be delayed, resulting in a detrimental effect on their health and possibly loss of life as a result of Defendants' wrongful conduct.

## Claim 3: Tortious interference with Contract

114.	The County hereby incorporates the prior allegations of its Complaint as if fully set forth herein.

115.	The conduct of Defendants HMC and RCHA constitute intentional and tortious interference with the Sale Agreement and Lease.

116.	The Sale Agreement and Lease were valid contracts including both the County and CAH 10.

117.	These agreements confer upon the County contractual rights vis-à-vis CAH 10 and impose contractual duties on CAH 10.

118.	All Defendants knew of the agreements between the County and CAH 10.

119.	Defendants HMC and RCHA intentionally interfered with such contracts by directing or inducing CAH 10 to breach and not to perform the contract.

120.	Defendants HMC and RCHA did so without adequate legal justification.

121.	Such interference has resulted in real and actual damage to the County and to the residents of Yadkin County which was proximately caused by such conduct.

122.	The County is entitled to recover damages in an amount in excess of $25,000 based upon such interference.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Yadkin County respectfully prays the Court that:

1.  The County have and recover judgment against Defendant in an amount to be determined by a jury in the trial of this action but in any event in excess of the sum of $25,000.00;

2.  The County have the relief provided by North Carolina General Statute 75-16 and have its damages trebled;

3.  These claims be tried before a jury;

4.  Costs be awarded against Defendants;

5.  The County have and recover its reasonable attorneys fees as permitted by law; and

6.  The County have such other and further relief as may be deemed just and proper.

This the 3rd day of June, 2015.

SMITH MOORE LEATHERWOOD LLP

/s/ William R. Forstner

William R. Forstner
N.C. State Bar No. 32675
Bill.forstner@smithmoorelaw.com
Elizabeth Sims Hedrick
N.C. State Bar No. 38513
Elizabeth.hedrick@smithmoorelaw.com
434 Fayetteville Street, Suite 2800 (27601)
Post Office Box 27525
Raleigh, North Carolina 27611
Telephone: (919) 755-8700
Facsimile: (919) 755-8800

<u>**CERTIFICATE OF SERVICE**</u>

 The undersigned does hereby certify that a copy of the COMPLAINT was filed with the clerk using the CM/ECF system which will send notice to all parties of record and electronic notification and was served by United States First Class mail upon the following parties:

  J. Alexander S Barrett
  Hagan Davis Mangum Barrett & Langley PLLC
  300 N. Greene Street, Suite 200
  Greensboro, NC 27401
  Attorneys for CAH Acquisition Company 10 LLC

And was served by certified mail, return receipt requested upon the following parties:

  HMC/CAH Consolidated, Inc.
  c/o Management Agent
  1100 Main Street, Suite 2350
  Kansas, MO  64105

  Rural Community Hospitals of America LLC
  c/o Registered Agent:  Corporation Service Company
  327 Hillsborough Street
  Raleigh, NC  27603

This, the 3rd day of June, 2015.

        SMITH MOORE LEATHERWOOD LLP


      By:  /s/ William R. Forstner